# STATE OF CONNECTICUT *v.* JEAN BRUNY
## (SC 20174)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of the crimes of murder and criminal possession of a pistol or
revolver in connection with the shooting death of the victim inside a
nightclub, the defendant appealed to this court. Prior to the shooting,
the defendant and several other individuals, including T, H and M, arrived
at the nightclub. About forty-five minutes later, the victim arrived with
his cousin, W, and a few friends. The victim's group and the defendant's
group were at opposite ends of the nightclub's main room. Soon there-
after, the defendant made his way toward the area where the victim's
group was standing and stood behind them. Immediately after someone
in the defendant's group threw a bottle at the victim's group, the defen-
dant stepped forward, aimed a handgun at the back of the victim's head,
and fired. The victim fell to the ground, and the defendant ran and
exited the nightclub. Video from before, during and after the shooting
was captured on surveillance cameras in or around the nightclub. Multi-
ple witnesses who either knew the defendant or were acquainted with

State *v.* Bruny

him provided testimony at the defendant's trial identifying him in the surveillance footage. On appeal to this court from the judgment of conviction, *held*:

1. The defendant could not prevail on his claim that the trial court had abused its discretion in admitting the testimony of four lay witnesses, T, H, M, and S, identifying the defendant as one of the persons depicted in the surveillance footage of the interior and exterior of the nightclub where the shooting occurred insofar as their testimony improperly embraced an ultimate issue to be decided by the jury, in violation of the Connecticut Code of Evidence (§ 7-3 (a)): in *State* v. *Gore* (342 Conn. 129), this court amended § 7-3 (a) of the Code of Evidence to incorporate an exception to the ban on lay opinion testimony that embraces an ultimate issue for opinion testimony that relates to the identification of a criminal defendant depicted in a surveillance video or photograph, and such testimony is admissible if, in accordance with the provision (§ 7-1) of the Code of Evidence governing the admissibility of lay opinion testimony, it is rationally based on the perception of the witness and is helpful to a clear understanding of that witness' testimony or the determination of a fact in issue; moreover, testimony identifying a defendant in surveillance footage meets the requirements of § 7-1 if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the footage than is the jury, and that determination should be based on consideration of several factors, in light of the totality of the circumstances, including the witness' general familiarity with the defendant's appearance, the witness' familiarity with the defendant's appearance, including items of clothing worn, at the time that the surveillance video or photographs were taken, a change in the defendant's appearance between the time the surveillance video or photographs were taken and the time of trial, or the subject's use of a disguise in the surveillance footage, and the quality of the video or photographs, as well as the extent to which the subject is depicted in the surveillance footage; in the present case, S, T and H had sufficient general familiarity with the defendant, as S was the defendant's foster mother, and all three witnesses had known the defendant for many years, and, although the degree of M's general familiarity with the defendant was low, she, T and H were with the defendant on the day of the shooting and were familiar with his appearance at the time that the surveillance footage was taken; furthermore, the fact that the defendant's appearance had changed between the time that the surveillance footage was recorded and the time of trial, as well as the quality of the video, weighed in favor of the admissibility of the challenged testimony.

2. The defendant could not prevail on his claim that the trial court improperly had admitted the expert testimony of E, a forensic examiner, regarding an enhanced video that he compiled from the raw surveillance footage of the nightclub and in which he tracked the movement of certain individuals throughout the nightclub using alphanumeric codes, on the

State *v.* Bruny

ground that E's testimony invaded the province of the jury, in violation of § 7-3 (a) of the Connecticut Code of Evidence: this court determined that expert testimony pertaining to the identification of a defendant in surveillance footage is admissible if it comports with the requirements of the provision (§ 7-2) of the Connecticut Code of Evidence governing the admissibility of expert testimony, and the trial court correctly concluded that E's testimony met those requirements, as E's experience and training in the area of forensic video analysis were extensive, his skill and knowledge were directly applicable to the jury's task of interpreting the surveillance footage, his expertise enabled him to analyze the surveillance footage in a manner that was beyond the ability of the average person, and his testimony and the enhanced video itself likely were helpful to the jury; moreover, E never identified the defendant as the shooter, the identity of the defendant as the shooter in the video was a determination left to the jury, and, therefore, E's testimony did not invade the province of the jury; accordingly, the trial court acted within its broad discretion in admitting E's testimony.

3. This court declined to address the defendant's claim concerning whether the trial court had incorrectly concluded that defense counsel opened the door to certain of E's testimony on redirect examination regarding the surveillance footage, because, even if that conclusion had been incorrect, the defendant failed to demonstrate that any error was harmful; although this court found it troubling that the trial court permitted E to testify, during redirect examination, that the notes of a special agent with the Federal Bureau of Investigation indicated that the individual labeled with a certain alphanumeric code in the enhanced video and who shot the victim was the defendant, insofar as the trial court, in doing so, undermined all attempts to distance E's testimony from directly identifying the defendant as the shooter, the state presented overwhelming evidence that the individual in the video who was assigned that specific alphanumeric code shot the victim and that that individual was the defendant.

4. The trial court did not abuse its discretion in denying the defendant's request for a special credibility instruction as to P, a witness who was in prison at the time of the defendant's trial and who, according to the defendant, should have been treated as a jailhouse informant when he testified that, one month before the shooting, he observed the defendant with a gun and acknowledged on cross-examination that he was hoping to receive favorable treatment in exchange for the information he provided: the rule requiring a special credibility instruction for jailhouse informants did not apply to P's testimony, as that testimony did not relate to an inculpatory statement or confession that the defendant made to P while they were incarcerated together but, rather, concerned P's observations of the defendant outside of the prison context; moreover, although this court previously had expanded the special credibility instruction requirement to include informants who receive no promise

State *v.* Bruny

from the state in exchange for their testimony and incarcerated witnesses who testify that the defendant confessed or made inculpatory statements to them outside of prison, it declined to adopt a rule requiring such an instruction for testimony regarding observed events but did not foreclose the possibility that a trial court could exercise its discretion to give a special credibility instruction when the witness' testimony relates to an event rather than to a statement; furthermore, defense counsel impeached P's credibility effectively during cross-examination, and counsel presented testimony from an expert witness who testified about the unreliability of jailhouse informants.

(*One justice concurring separately*)

5. The defendant could not prevail on his claim that the trial court improperly had denied his motion to suppress the out-of-court and in-court identifications of the defendant made by W, who was the victim's cousin, was present at the nightclub on the night of the shooting, and had "bad blood" with one of the individuals in the defendant's group, this court having determined that, even if the identifications should have been suppressed, any error in admitting them was harmless: the state's case was strong and did not rely on eyewitness testimony but relied, instead, on the fact that the defendant was captured in the surveillance video shooting the victim; moreover, defense counsel impeached W's credibility thoroughly and effectively during cross-examination, highlighting many inconsistencies in W's stories as they evolved each time he met with law enforcement, and also highlighting that W waited for approximately three and one-half years to come forward to the police, that he was incarcerated and faced a lengthy sentence when he did finally come forward, and that he had a motive to lie because he was testifying pursuant to a cooperation agreement; furthermore, the testimony of the defendant's expert witness concerning the unreliability of jailhouse informant testimony further reinforced W's motivation to lie, the trial court gave a special credibility instruction as to W, reminding the jury that W was testifying pursuant to a cooperation agreement, and W's testimony was cumulative of other, more persuasive evidence.

6. The defendant's claim that the state had presented insufficient evidence to prove beyond a reasonable doubt the element of the crime of criminal possession of a pistol or revolver that the gun in question have a barrel length of less than twelve inches was unavailing: although the gun that the defendant allegedly was holding when he shot the victim was not introduced into evidence and no person testified that he or she saw the gun on the night of the shooting, that gun was visible in the surveillance footage and appeared to be approximately the size of the shooter's hand; moreover, the expert testimony of a firearm and tool mark examiner and the testimony of P that, approximately one month prior to the shooting, he saw the defendant in possession of a semiautomatic hand-

State *v.* Bruny

gun that was slightly larger than P's own hand, provided further support for a finding that the gun barrel was the requisite length.

Argued November 19, 2020—officially released February 7, 2022*

*Procedural History*

Substitute information charging the defendant with the crimes of murder and criminal possession of a pistol or revolver, brought to the Superior Court in the judicial district of New Haven, where the court, *Blue, J.*, denied or denied in part the defendant's motions to preclude certain evidence; thereafter, the charge of murder was tried to the jury before *Blue, J.*; verdict of guilty; subsequently, the charge of criminal possession of a pistol or revolver was tried to the court; finding of guilty; thereafter, the court, *Blue, J.*, rendered judgment of guilty in accordance with the jury's verdict and the court's finding, from which the defendant appealed to this court. *Affirmed.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, *Seth R. Garbarsky*, senior assistant state's attorney, and *Lisa M. D'Angelo*, assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. This is the companion case to *State* v. *Gore*, 342 Conn. 129,     A.3d     (2022), decided today. In *Gore*, we amended § 7-3 (a) of the Connecticut Code of Evidence to incorporate an exception to the ultimate issue rule for opinion testimony that relates to the identification of criminal defendants and other persons

* February 7, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Bruny

depicted in surveillance video or photographs.[1] Our decision in *Gore* addresses how the change to our Code of Evidence affects the admissibility of lay opinion testimony identifying a defendant in surveillance video or photographs. In this appeal, we consider how the rule change affects the admissibility of expert opinion testimony relating to the identification of a defendant in surveillance video or photographs. Put simply, we conclude that such testimony is admissible if it meets the requirements of § 7-2 of the Connecticut Code of Evidence.[2]

The defendant, Jean Bruny, appeals from the judgment of conviction, rendered following a jury trial, of murder in violation of General Statutes § 53a-54a (a) and criminal possession of a pistol or revolver in violation of General Statutes (Rev. to 2013) § 53a-217c (a) (1).[3] In this appeal, the defendant claims that the trial court (1) improperly admitted testimony from four lay witnesses identifying the defendant in video surveillance footage, (2) improperly admitted expert testimony regarding an enhancement of the video surveillance footage and incorrectly concluded that defense counsel had opened the door to certain testimony elicited during the prosecutor's redirect examination of the expert, (3) improperly denied the defendant's motion to suppress

[1] As we note in *State* v. *Gore*, supra, 342 Conn. 129, "[n]otwithstanding the codification of the common law in the Code of Evidence, this court retains the authority to develop and change the rules of evidence through case-by-case common-law adjudication." (Internal quotation marks omitted.) Id., 149 n.12, quoting *State* v. *DeJesus*, 288 Conn. 418, 421, 953 A.2d 45 (2008).

[2] Section 7-2 of the Connecticut Code of Evidence provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

[3] Unless otherwise noted, all subsequent references to § 53a-217c are to the 2013 revision of the General Statutes.

State *v.* Bruny

the identifications of the defendant made by Nigel Watts, and (4) improperly denied the defendant's request for a special credibility instruction as to a witness whom the defendant claims should have been treated as a jailhouse informant. Finally, the defendant claims that there was insufficient evidence to support his conviction for criminal possession of a pistol or revolver. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the night of August 10, 2013, the defendant, his foster brother, Teon Simons (Teon), and Teon's cousins, Solomon Graham (Solomon), Tyrone Graham (Tyrone) and Jamal Hopper, were all at Tyrone's home in Waterbury. Also at Tyrone's home were Latoya Maia, Randy Hall and some of Maia's friends. Sometime between 11 and 11:30 p.m., the group decided to go to the Cheetah Club in New Haven, where a rapper, Lil Durk, was performing that night. Traveling in multiple cars, the group left Waterbury sometime after 11:45 p.m. and arrived at the Cheetah Club at approximately 12:30 a.m. While they were at the club, the group spent most of their time in a room called the Cheetah room.

About forty-five minutes after the defendant's group arrived at the club, the victim, Torrance Dawkins, arrived with his cousin, Watts, and a few friends. The victim's group, who were celebrating the victim's birthday that night, walked over to a corner of the Cheetah room near the emergency exit and stood at the end of a long bar that lined a wall in the room. The defendant's group, including Hall, was at the opposite corner of the room, near a door that led to the patio area of the club, where Lil Durk was performing. Watts recognized Hall, with whom he had "bad blood . . . ." He warned the others in his group to expect a fight.

Soon thereafter, the defendant gradually made his way toward the area where the victim's group was standing

State *v.* Bruny

and positioned himself at the emergency exit door. From that position, the defendant stood behind the victim's group as they faced Hall. At that point, Hall threw a bottle at the victim's group.

Seconds after Hall threw the bottle, the defendant stepped forward from the emergency exit to within a foot or two from the victim, aimed a handgun at the back of his head and fired. The victim fell to the ground. Almost everyone else, including the defendant, ran from the room. The defendant slid to the floor while he sprinted toward the exit from the Cheetah room, and then jumped up and raced out of the room. He then ran out the front entrance of the club.

Shortly after the New Haven police responded to reports of a shooting at the club, Detective David Zaweski arrived at the scene and reviewed the video surveillance footage, which had captured the shooting. Zaweski downloaded the Cheetah Club surveillance videos to a thumb drive. A copy of the footage was later sent to Anthony Imel, a forensic examiner with the Federal Bureau of Investigation (FBI).

On January 15, 2015, Zaweski, Special Agent Jonathan Lauria of the FBI and a third investigator interviewed the defendant. During the interview, the defendant declined to identify photographs of Tyrone and Solomon and denied having been at the Cheetah Club on the night of the shooting. He claimed that he had visited Connecticut only once, when he was younger, with his foster mother, Stephanie Simons (Stephanie).

On April 6, 2016, while the defendant was in federal custody, Lauria again interviewed him. When Lauria showed the defendant still photographs from the surveillance videos, the defendant denied seeing himself in the photographs and claimed that he did not recall being present at the Cheetah Club. While he was in federal custody, the defendant's phone calls were recorded.

State *v.* Bruny

During a phone call he placed sometime after his interview with Lauria, the defendant said that he had seen the video surveillance footage, and "it's looking real bad." When the person on the other end of the line asked if the video footage was "clear as day," the defendant responded that it was not, but that it was "clear enough, damn it." Speculating on his chances of securing a plea deal, the defendant stated that he "might be lucky" if he received "fifteen."

The defendant was subsequently charged with murder in violation of § 53a-54a (a), criminal possession of a pistol or revolver in violation of § 53a-217c (a) (1), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a).[4] Following a jury trial, he was found guilty of murder. The trial court subsequently found him guilty of criminal possession of a pistol or revolver. The court imposed a total effective sentence of fifty years of incarceration.

I

The defendant contends that the trial court abused its discretion in admitting the testimony of four lay witnesses, Tyrone, Hopper, Stephanie and Maia, identifying him as one of the persons depicted in the surveillance video of the interior and exterior of the Cheetah Club. In his original brief to this court, the defendant claimed that the lay opinion testimony improperly embraced an ultimate issue to be decided by the jury and, therefore, violated § 7-3 of the Connecticut Code of Evidence.[5] Following oral argument, we ordered the

_____

[4] The state entered a nolle prosequi as to the charge of carrying a pistol without a permit.

Moreover, although § 29-35 (a) was the subject of a technical amendment in 2016; see Public Acts 2016, No. 16-193, § 9; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[5] Section 7-3 of the Connecticut Code of Evidence provides: "(a) General rule. Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that, other than as provided in subsection (b), an expert witness may give an opinion that

State *v.* Bruny

parties to submit supplemental briefs addressing two
issues: (1) "Whether this court should adopt rule 704
(a) of the Federal Rules of Evidence and overrule *State*
v. *Finan*, 275 Conn. 60, 61, 881 A.2d 187 (2005)?" And
(2) "[i]f the court adopts rule 704 (a) of the Federal
Rules of Evidence, what standard should govern the
admission of expert opinion testimony, relating to the
identification of a defendant in surveillance photo-
graphs or video, that embraces an ultimate issue?" As
we explain in *State* v. *Gore*, supra, 342 Conn. 134–35,
rather than adopt rule 704 (a) of the Federal Rules of
Evidence, we amend § 7-3 (a) of the Connecticut Code
of Evidence to incorporate an exception to the ban on
lay opinion testimony that embraces an ultimate issue
for opinion testimony that relates to the identification
of criminal defendants and other persons depicted in
surveillance video or photographs.[6] Applying that rule,
we conclude that the trial court did not abuse its discre-
tion in admitting the testimony.

embraces an ultimate issue where the trier of fact needs expert assistance
in deciding the issue.

"(b) Mental state or condition of defendant in a criminal case. 'No expert
witness testifying with respect to the mental state or condition of a defendant
in a criminal case may state an opinion or inference as to whether the
defendant did or did not have the mental state or condition constituting an
element of the crime charged or of a defense thereto, except that such
expert witness may state his diagnosis of the mental state or condition of
the defendant. The ultimate issue as to whether the defendant was criminally
responsible for the crime charged is a matter for the trier of fact alone.'
General Statutes § 54-86i."

The rule change we announce today effects no change to § 7-3 (b) of the
Connecticut Code of Evidence.

[6] The change we make today to § 7-3 (a) of the Connecticut Code of
Evidence addresses the majority of the concerns raised by the defendant
in his supplemental brief arguing against the adoption of rule 704 (a) of the
Federal Rules of Evidence. As for the defendant's arguments concerning
our abandonment of the ultimate issue rule in this narrow context, we
disagree with the defendant that the rule change will result in testimony
that invades the province of the jury. The rule that we have crafted, as set
forth in *State* v. *Gore*, supra, 342 Conn. 129, ensures that only witnesses
whose familiarity with the defendant puts them in a better position than the
jurors to do so will be allowed to identify a defendant in surveillance footage.

State *v.* Bruny

The following additional facts and procedural background are relevant to our resolution of this issue. There were multiple video surveillance cameras at the Cheetah Club, including cameras that captured video of the exterior of the building, the interior entrance and two different angles of the interior of the Cheetah room. Prior to trial, the defendant moved to preclude the state from presenting any testimony from witnesses identifying him in the video surveillance footage. Relying on § 7-3 (a) of the Connecticut Code of Evidence and this court's decision in *State* v. *Finan*, supra, 275 Conn. 67, the defendant argued that any testimony identifying him in the video footage would constitute improper lay opinion embracing an ultimate issue to be decided by the trier of fact.

During argument on the motion to preclude opinion testimony, defense counsel did not dispute that Stephanie, Tyrone and Hopper had general familiarity with the defendant.[7] The debate instead focused on the timing of the identifications. Specifically, the parties disagreed regarding whether witness testimony that identified the defendant in the video surveillance footage, but did not identify him in the footage covering the shooting or the few seconds preceding and following it, would embrace an ultimate issue, in violation of *Finan*. The trial court ruled that *Finan* did not bar the state from presenting testimony that identified the defendant in the surveillance video while engaged in noncriminal activity before and after the shooting.

Stephanie was the only one of the four lay witnesses identifying the defendant in the surveillance video who did not accompany him to the Cheetah Club that night. She had known the defendant since his placement as

---

[7] Because Maia was unavailable to testify at the suppression hearing, the trial court postponed its ruling as to her identification of the defendant in the surveillance video until the time of trial. The court subsequently ruled that Maia's identification of the defendant was admissible.

State *v.* Bruny

her foster son in her home when he was twelve years old, approximately nine years before the video surveillance footage was recorded. She identified the defendant entering the club, immediately behind Tyrone, at 7:03:55 a.m.[8] in the video surveillance footage and at 7:03:54 a.m. in a still photograph from the video footage. She also identified the defendant running out of the club in the video footage and in a corresponding still photograph.

The remaining three witnesses who identified the defendant in the video, Tyrone, Maia and Hopper, were with the defendant at the club on the night of the shooting. Tyrone identified himself in line entering the club at 7:03:53 a.m. in the video surveillance footage and identified the defendant as the person immediately behind him. Tyrone had known the defendant for approximately nine years, since the defendant became Stephanie's foster son. Although the defendant lived in Brooklyn and Tyrone lived in Waterbury, they often saw each other on weekends. Tyrone considered the defendant to be his cousin and referred to him by the nicknames "Cuz" and "L. B.," short for "Little Blood." Tyrone explained that "Little Blood" referred to the defendant's status as Tyrone's family, his "blood."

Hopper identified the defendant as the person walking immediately behind Tyrone, whom Hopper identified as entering the club at 7:03:53 a.m. in the video surveillance footage. Hopper first met the defendant when Hopper moved to Connecticut, sometime around 2011. The record is unclear as to how frequently he saw the defendant during the two years leading up to the murder, but Hopper testified that he occasionally vis-

[8] Zaweski testified that the time stamped on the video surveillance footage was "approximately six hours and thirty-four minutes ahead of the actual time." For simplicity, we refer to the time stamped on the video surveillance footage, not the actual time.

ited the home of Stephanie, who was Hopper's aunt, and that he lived with her for a few months.

Like Tyrone, Hopper and Stephanie, Maia identified Tyrone in the video surveillance footage entering the club at 7:03:53 a.m., immediately followed by the defendant at 7:03:54 a.m. Maia admitted that she "didn't really know" the defendant. She met the defendant through Solomon, whom she had been dating for only a few months by the time of the shooting. During those months, Maia had seen the defendant approximately five or six times. She had interacted and spoken with him enough on those occasions to describe him as a "quiet guy" who went by the nickname, "L. B." Maia did not know the defendant's real name.

As we explain in *State* v. *Gore*, supra, 342 Conn. 134–35, we have amended § 7-3 (a) of the Connecticut Code of Evidence to incorporate an exception to the ultimate issue rule for lay opinion testimony that relates to the identification of criminal defendants or other persons depicted in surveillance video or photographs. Accordingly, "[l]ay opinion testimony identifying a person in surveillance video or photographs is admissible if that testimony meets the requirements of § 7-1 of the Connecticut Code of Evidence. That is, such testimony is admissible if the opinion is 'rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue.' Conn. Code Evid. § 7-1." (Footnote omitted.) *State* v. *Gore*, supra, 148.

Testimony identifying a defendant as depicted in surveillance video or photographs meets the requirements of § 7-1 of the Connecticut Code of Evidence and is therefore admissible " 'if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph [or video] than is the jury.' *United States* v. *Farnsworth*, 729 F.2d 1158,

State *v.* Bruny

1160 (8th Cir. 1984).'' *State* v. *Gore*, supra, 342 Conn. 150.
In making this determination, we evaluate the following
four factors, considering the totality of the circum-
stances: ''(1) the witness' general level of familiarity
with the defendant's appearance . . . (2) the witness'
familiarity with the defendant's appearance, including
items of clothing worn, at the time that the surveillance
video or photographs were taken . . . (3) a change
in the defendant's appearance between the time the
surveillance video or photographs were taken and trial,
or the subject's use of a disguise in the surveillance
footage . . . and (4) the quality of the video or photo-
graphs, as well as the extent to which the subject is
depicted in the surveillance footage.'' (Citations omit-
ted.) Id., 151.

Three of the four witnesses had sufficient general
familiarity with the defendant to support admissibility.
As we explain in *Gore*, we depart from the majority of
jurisdictions that have set a low bar for general familiar-
ity. See id., 163–64. Pursuant to our decision in *Gore*,
''[i]n order for the witness' general familiarity with the
defendant's appearance to weigh in favor of admitting
such testimony, the proponent of the testimony must
demonstrate that the witness possesses more than a
minimal degree of familiarity with the defendant. Some
illustrative examples of persons who may satisfy this
standard are friends, longtime acquaintances, neigh-
bors, coworkers, family members, and former class-
mates.'' Id., 164.

This factor is satisfied as to Stephanie, Tyrone and
Hopper. Stephanie's relationship with the defendant—
he was placed in her home as her foster son approxi-
mately nine years prior to the shooting—easily supports
admissibility. As his foster mother, Stephanie is pre-
cisely the type of witness whose testimony best aids
the jury. Her familiarity with the defendant's appear-
ance and mannerisms, acquired during the years he

State *v.* Bruny

lived in her home, lends reliability to her identification of him in the surveillance footage. Similarly, Tyrone's degree of general familiarity with the defendant is more than sufficient to support admissibility. He testified that he and the defendant knew each other since the defendant's placement in Stephanie's home, and that they were close. They saw each other often, and Tyrone considered the defendant a cousin. Although Hopper did not have a relationship with the defendant that anyone would describe as "close," he certainly had more than a minimal degree of familiarity with the defendant. Hopper had known the defendant for approximately two years, had visited Stephanie's home during that time, and had lived with Stephanie for a few months. His degree of general familiarity, therefore, supports admitting his testimony identifying the defendant in the surveillance footage.

This factor is not satisfied as to Maia. She knew the defendant only through Solomon, whom she had been dating for a scant few months. During that period, she saw the defendant approximately five or six times, and the record is unclear as to the length of each of these encounters, the viewing conditions, or the nature of her interaction with the defendant on those occasions. Maia admitted that she did not "know" the defendant and did not even know his real name. On the basis of this record, we cannot say that she had more than a minimal degree of familiarity with the defendant. As we explain in *Gore*, "the concept of familiarity encompasses a broad range of possibilities." *State* v. *Gore*, supra, 342 Conn. 162. Along that continuum of possibilities, Maia barely qualifies as a casual acquaintance. Her low degree of familiarity with the defendant casts doubt on the reliability of her identification of him in the surveillance footage, particularly considering that more than one and one-half years had passed between the

State *v.* Bruny

last time she saw him and the first time she viewed the surveillance footage.

With respect to the second factor, Tyrone, Hopper and Maia were with the defendant on the day of the shooting—both at the club and beforehand, in Waterbury. All three, therefore, were familiar with his appearance at the time that the surveillance footage was taken. Although Stephanie did not see the defendant on the day of the shooting, and the record is unclear regarding the last time she saw him prior to that day, her high degree of general familiarity with the defendant more than offsets this factor. Moreover, as we explain in *Gore*, because we evaluate the factors under the totality of the circumstances, the failure to satisfy a single factor is not fatal. Id., 165 n.19.

With respect to the third factor, the defendant's appearance had changed between the time that the surveillance footage was recorded and the time of trial. In the video surveillance footage, the defendant wore his hair very short. Although he had some facial hair, he wore that short as well. Witnesses who identified the defendant in court at the time of trial described him as having dreadlocks, a beard and a mustache. Courts have considered changes in a criminal defendant's hairstyle or facial hair between the recording of the surveillance video and the time of trial to weigh in favor of admissibility. See, e.g., *United States* v. *Farnsworth*, supra, 729 F.2d 1160–61 (defendant wore scarf over his face at time of robbery and had grown beard by time of trial); see also, e.g., *United States* v. *Towns*, 913 F.2d 434, 445 (7th Cir. 1990) (defendant shaved his moustache between robbery and criminal trial); *United States* v. *Lucas*, 898 F.2d 606, 610–11 (8th Cir.) (defendant had facial hair in surveillance photographs but none at trial), cert. denied, 498 U.S. 838, 111 S. Ct. 112, 112 L. Ed. 2d 81 (1990).

State *v.* Bruny

Finally, as for the quality of the video, it fell within the range that favors admissibility. That is, the video, in which the defendant frequently appeared, was " '[neither] so unmistakably clear [nor] so hopelessly obscure that the witness is no [better suited] than the jury to make the identification.' *United States* v. *Jackman*, [48 F.3d 1, 5 (1st Cir. 1995)]." *State* v. *Gore*, supra, 342 Conn. 165.

We conclude that, viewed under the totality of the circumstances, the trial court acted within its discretion in admitting the testimony of all four witnesses, which was rationally based on their perception and helpful to the jury. See Conn. Code Evid. § 7-1. The trial court properly allowed those witnesses to identify the defendant in the surveillance video footage and still photographs from the video. All four factors supported admitting the testimony of Tyrone and Hopper. As to Stephanie, we have noted that, although she did not see the defendant on the night of the shooting, her high degree of general familiarity more than offsets the failure to satisfy that single factor. With respect to Maia, although her level of general familiarity is low, she was with the defendant on the night of the shooting and therefore was familiar with his appearance at the time of the surveillance footage. That, taken together with the remaining two factors, supports admitting her testimony identifying the defendant in the surveillance video and the still photographs.[9]

---

[9] Although we reach our conclusion by applying the rule that we announced today in *State* v. *Gore*, supra, 342 Conn. 129, we emphasize that we would have arrived at the same result by applying § 7-3 (a) of the Connecticut Code of Evidence, as interpreted by *State* v. *Finan*, supra, 275 Conn. 60. The testimony of the witnesses did not embrace an ultimate issue to be decided by the trier of fact. None of the witnesses testified that they saw the defendant shoot the victim. No witness identified the defendant in the surveillance video or still photographs from the video at the time of the shooting. Evidence that the defendant entered the Cheetah Club approximately fifty minutes before the shooting and was one of many, presumably hundreds, of people who ran out of the club after the shooting does not establish that he was the shooter and, therefore, would not have violated *Finan.*

State *v.* Bruny

## II

## A

The defendant claims that the trial court abused its discretion in allowing the state's expert, Imel, a forensic examiner, to testify regarding an enhanced video he compiled from the raw video surveillance footage, tracking the movement of certain individuals through the club. The defendant contends that Imel's testimony invaded the province of the jury, in violation of § 7-3 (a) of the Connecticut Code of Evidence, as interpreted by this court in *State* v. *Finan*, supra, 275 Conn. 60. We conclude that the trial court acted within its discretion in admitting the testimony.

We emphasize, at the outset, that Imel never identified the defendant as the shooter and was never asked to do so. In his testimony, Imel explained, instead, how he tracked the movements of various individuals, who, except for the victim, were identified only by alphanumeric code, using video surveillance footage of the Cheetah Club gathered from multiple camera angles. Although the defendant was depicted in the video footage, and Imel tracked images of the defendant using the alphanumeric code, the identity of the defendant was left to the jury. Against this backdrop, we hold that expert opinion testimony that pertains to the identification of a defendant in surveillance footage is admissible if it comports with the requirements of § 7-2 of the Connecticut Code of Evidence, which provides: "A wit-

Because our application of the new rule does not change the result of the appeal, we disagree with the defendant's claim, in his supplemental brief, that we should not apply the new rule in this appeal. As we explained in *Gore*, "[r]ather than apply an analysis that we have determined to be grounded on artificial and illusory distinctions, we believe that the better approach is to provide the trial courts with an illustration of the application of the totality of the circumstances test that we adopt today." *State* v. *Gore*, supra, 342 Conn. 139.

State *v.* Bruny

ness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, *if the testimony will assist the trier of fact* in understanding the evidence or in determining a fact in issue.'' (Emphasis added.)

Our task, therefore, is to consider whether the trial court correctly determined that Imel's testimony comported with the requirements of § 7-2 of the Connecticut Code of Evidence. The legal principles that guide our review of the trial court's ruling on the admissibility of expert testimony are well settled. ''The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues.'' (Internal quotation marks omitted.) *State* v. *Leniart*, 333 Conn. 88, 142, 215 A.3d 1104 (2019), quoting *State* v. *Taylor G.*, 315 Conn. 734, 760, 110 A.3d 338 (2015). ''It is well settled that [t]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue. . . . Implicit in this standard is the requirement . . . that the expert's knowledge or experience . . . be directly applicable

State *v.* Bruny

to the matter specifically in issue.'' (Internal quotation marks omitted.) *State* v. *Leniart*, supra, 142. "To the extent the trial court makes factual findings to support its decision, we will accept those findings unless they are clearly improper." (Internal quotation marks omitted.) *Fleming* v. *Dionisio*, 317 Conn. 498, 505, 119 A.3d 531 (2015).

In his motion to preclude the expert testimony, the defendant argued that it improperly invaded the province of the jury and violated this court's decision in *Finan*. Following the state's proffer, and after hearing argument on the motion, the trial court ruled that the testimony was admissible. The court began by considering the requirements of § 7-2 of the Connecticut Code of Evidence. The court was satisfied that Imel possessed knowledge, skill, experience, training and education that were both directly applicable to the matter at issue and not common to the average person. The court also found that the testimony would be helpful to the jury. In order to avoid any conflict with § 7-3 (a) and *Finan*, however, the court required Imel to remove all identifying labels over the subjects in the video in the seconds immediately before and after the shooting. The court reasoned that, if the enhanced video did not display a label over any persons depicted in the video at the actual time of the shooting, the video and Imel's testimony would not invade the province of the jury.

The trial court correctly concluded that Imel's testimony met the standards of § 7-2 of the Code of Evidence. Imel's testimony regarding tracking individuals in the surveillance video footage is akin to expert testimony regarding facial and clothing comparison and photogrammetry[10] applied to surveillance video and

---

[10] Photogrammetry is the science of "calculating the heights of objects from their photographic images." *United States* v. *Everett*, 825 F.2d 658, 662 (2d Cir. 1987), cert. denied, 484 U.S. 1069, 108 S. Ct. 1035, 98 L. Ed. 2d 999 (1988).

State *v.* Bruny

photographs. Those types of expert testimony have generally been held to be admissible under rule 702 of the Federal Rules of Evidence, which "treat[s] expert opinion testimony similarly to the Connecticut Code of Evidence."[11] *State* v. *Favoccia*, 306 Conn. 770, 837 n.8, 51 A.3d 1002 (2012) (*Zarella, J.*, dissenting); see, e.g., *United States* v. *Everett*, 825 F.2d 658, 662 (2d Cir. 1987) (trial court did not abuse discretion in admitting testimony of photogrammetry expert interpreting bank surveillance photographs), cert. denied, 484 U.S. 1069, 108 S. Ct. 1035, 98 L. Ed. 2d 999 (1988); *United States* v. *Alexander*, 816 F.2d 164, 167 (5th Cir. 1987) (exclusion of facial comparison testimony of defense expert interpreting bank surveillance video and photographs was clearly erroneous); *United States* v. *Green*, 525 F.2d 386, 391–92 (8th Cir. 1975) (expert testimony comparing clothing in bank surveillance photographs with clothing worn by model in photographs taken by law enforcement was admissible). But see, e.g., *United States* v.

---

[11] Rule 702 of the Federal Rules of Evidence provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

"(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

"(b) the testimony is based on sufficient facts or data;

"(c) the testimony is the product of reliable principles and methods; and

"(d) the expert has reliably applied the principles and methods to the facts of the case."

Compare rule 702 of the Federal Rules of Evidence with § 7-2 of the Connecticut Code of Evidence; see footnote 2 of this opinion; and § 7-4 of the Connecticut Code of Evidence, which provides in relevant part: "(a) Opinion testimony by experts. An expert may testify in the form of an opinion and give reasons therefor, provided sufficient facts are shown as the foundation for the expert's opinion.

"(b) Bases of opinion testimony by experts. The facts in the particular case upon which an expert bases an opinion may be those perceived by or made known to the expert at or before the proceeding. The facts need not be admissible in evidence if of a type customarily relied on by experts in the particular field in forming opinions on the subject. The facts relied on pursuant to this subsection are not substantive evidence, unless otherwise admissible as such evidence. . . ."

State *v.* Bruny

*Brown*, 501 F.2d 146, 149–50 (9th Cir. 1974) (trial court abused its discretion in admitting facial comparison testimony when comparisons testified to by expert were too general to be considered to require special expertise), rev'd on other grounds sub nom. *United States* v. *Nobles*, 422 U.S. 225, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975).

One state appellate court recently rejected a challenge to expert testimony strikingly similar to that at issue in the present case. In *People* v. *Tran*, 50 Cal. App. 5th 171, 263 Cal. Rptr. 3d 740 (2020), review denied, California Supreme Court, Docket No. S263358 (August 19, 2020), the California Court of Appeal for the Fourth District held that the trial court did not abuse its discretion in admitting the testimony of a forensic video analyst, Grant Fredericks, who created an enhanced video of an assault in a crowded outdoor restaurant dining area, compiled from videos taken from surveillance cameras of nearby businesses and from the cell phones of bystanders who witnessed the incident. See id., 174– 76, 179, 180, 188.

As Imel did in the present case, Fredericks added markings to the video to track certain individuals and to aid the jury in its task of interpreting the video. Id., 188. The Court of Appeal reasoned that the "challenged evidence was relevant, useful, and highly probative of the circumstances that led to [the victim's] paralysis. [Fredericks'] testimony helped the jury to identify what portions of the video evidence required closer examination and to interpret some of the information conveyed by the video evidence. His expertise was necessary for the [members of the] jury to accurately evaluate the videos to appreciate who and what they were watching as well as the chronology and relationship between each video. As the trial court noted, the individuals in the videos were very difficult to track 'even with the benefit of [Fredericks'] colored indicators,' and 'impos-

State *v.* Bruny

sible' to track without his expert assistance.'' Id., 188–89.

Imel's experience and training in the area of forensic video and image analysis were extensive. As of the time of trial, Imel had been analyzing video for approximately thirty years, approximately eight years of which were for the FBI as a forensic examiner with the forensic audio, video and image analysis laboratory. Over the years, he had taken and taught many classes on and conducted training in video forensics and image enhancement, including teaching a course on the subjects for the United States Department of State. He was the primary forensics examiner for the Boston Marathon bombing and performed video tracking analysis for that investigation, as well as for the Pulse nightclub shooting in Florida. In the Boston Marathon investigation, he tracked the movements of the bombing suspects among thousands of individuals, utilizing multiple camera views.

Imel's skill and knowledge were directly applicable to the jury's task in the present case. Like the Boston Marathon and Pulse nightclub investigations, the present case involved video surveillance footage from multiple cameras covering many individuals moving about in a crowded area. The lighting was low, and individuals moved in and out of view of the cameras—creating the need for a significant amount of cross-referencing of the footage from the various cameras. In order to create his fifty-two minute enhanced video, Imel compiled footage from multiple cameras, lightened images, added alphanumeric labels over certain individuals, including the defendant, tracked those individuals throughout the enhanced video, inserted ''halos'' over images at crucial points during the video in the minute leading up to and including the shooting, and simultaneously displayed coverage from two cameras in a slow motion, split screen image. All of those enhancements were directly applica-

State *v.* Bruny

ble to the jury's task of interpreting the surveillance footage.

Imel's training and expertise enabled him to analyze the video surveillance footage in a manner that was beyond the ability of an average person. He distilled the enhanced video from hours of raw video surveillance footage. The methodology that he used to accomplish the task involved both his specialized experience in tracking analyses and the adaptation of computer technology to enhance the video surveillance footage. His analysis took hundreds of hours, over the course of four months.

Imel described his methodology for undertaking a tracking analysis. Once individuals have been identified as the subjects of tracking, Imel tracks their movement through the video surveillance footage by relying on the appearance of the individuals and their clothing, how they move, the direction in which they are moving, and their positions and movement relative to other individuals depicted in the footage. Computer software enables him to review the video surveillance footage frame by frame. For each subject, Imel reviews that individual's movement forward—then backward—multiple times to confirm that subject's movement throughout the footage, one frame at a time. Once he has completed his analysis of one subject's movement throughout the entire course of the raw video surveillance footage, he performs the same analysis for the next subject.

Given the difficulty of reviewing hours of video surveillance footage from multiple camera angles, Imel's testimony, as well as the enhanced video itself, was likely helpful to the jury. During Imel's testimony, the prosecutor played the enhanced video, which was marked for identification only, periodically stopping the playback to ask Imel questions. At the start of the video,

State *v.* Bruny

Imel identified the first labels on the video, FW-1 and FW-2, which appeared above two women entering the club. He explained that these tags would follow the same two individuals throughout the video, marking their movement through the club. The majority of the footage in the enhanced video showed the Cheetah room, which was covered by two different surveillance cameras.

At about seven minutes before the end of the enhanced video, Imel identified a subject standing in front of the bar, tagged as "victim." As with all the other subjects, Imel tracked the victim from the entrance of the club. Less than one minute before the shooting, the image in the enhanced video split into two screens in order to show the Cheetah room from both camera angles, thus providing a fuller view of the scene. Seconds before the shooting, Imel inserted a halo over an individual labeled "MS-4," who stood behind the victim and appeared to be holding an object in his right hand. Per the trial court's ruling, the alphanumeric labels did not appear in the few seconds before and after the shooting. Immediately after the shooting, MS-4 could be seen running across the Cheetah room, and Imel inserted a halo over the right hand of MS-4 to highlight that he appeared to be holding something in that hand. The video shows that MS-4 then ran out of the front door of the club, along with many other patrons.

At no point during Imel's testimony did he state that he believed that MS-4 was the defendant.[12] Although

---

[12] We emphasize that, because Imel did not identify MS-4 as the defendant, we need not address in this opinion under what circumstances, if any, an expert witness may be permitted to do so. Imel's testimony merely served to explain the enhanced video and the nature of the tracking analysis Imel performed. Certainly, although the tracking labels, except for the victim's, were removed in the seconds immediately preceding and following the shooting, the video leaves little doubt that, whoever MS-4 may be, he shot the victim. Before the alphanumeric labels disappear, the video shows MS-4 aiming what appears to be a gun at the back of the victim's head. After the victim falls to the ground and the alphanumeric labels reappear, MS-4

State *v.* Bruny

Imel's testimony, understood in conjunction with the video, constituted persuasive proof that MS-4 shot the victim, the state was still required to prove that MS-4 was the defendant. Moreover, the tracking information depicted in the enhanced video, and Imel's expert testimony explaining it, could not have been developed by the average juror. That information thus assisted the jury in carrying out its task, without allowing the expert to identify the shooter. Accordingly, Imel's testimony did not invade the province of the jury. See, e.g., *State* v. *Guilbert*, 306 Conn. 218, 251–52, 49 A.3d 705 (2012) (expert testimony regarding reliability of eyewitness identifications did not invade province of jury because reliability of eyewitness identifications is not within knowledge of average juror); *State* v. *Borrelli*, 227 Conn. 153, 174, 629 A.2d 1105 (1993) (expert testimony regarding general characteristics of victims of domestic abuse did not invade province of jury because information testified to by expert was "beyond the jury's experience and knowledge"); see also, e.g., *United States* v. *Green*, supra, 525 F.2d 392 (expert testimony regarding detailed comparison of articles of clothing did not invade province of jury because average juror lacks skill and experience necessary to make such comparisons).

Accordingly, our review of the record persuades us that the trial court acted within its broad discretion in permitting Imel's testimony, which the court correctly concluded would assist the jury in its task of interpreting the surveillance footage. Imel's expertise was directly applicable to the jury's task, not common to the average person, and likely was helpful to the jury.

B

The defendant next claims that the trial court incorrectly concluded that defense counsel opened the door

is seen running away from the direction of the victim's body. Accordingly, Imel's testimony would be valid even under § 7-3 (a) of the Connecticut Code of Evidence, as interpreted by *Finan.*

to certain of Imel's testimony on redirect examination. Specifically, during redirect, Imel testified that Lauria's notes, which Lauria had sent to Imel along with the video surveillance footage, indicated that the individual labeled MS-4 was the defendant, who shot the victim. Even if we assume, without deciding, that the defendant is correct, we conclude that any error was harmless.

During cross-examination of Imel, defense counsel attempted to demonstrate that Lauria had influenced Imel's analysis of the raw video surveillance footage. Defense counsel elicited testimony from Imel that, when Lauria sent him the raw footage, he also included his notes, indicating his beliefs regarding the identity of certain individuals depicted in the video. In Lauria's notes, with respect to at least some of those individuals, he tracked their movements and incorporated specific time references from the raw video surveillance footage for those movements. For example, defense counsel asked Imel whether Lauria's notes indicated that, at 7:08:36 a.m., and, again, at 7:47:37 a.m., the individual labeled as MS-4 exited the Cheetah room to the patio. Imel answered that the notes had so indicated.

During redirect examination, the prosecutor asked Imel whether defense counsel had correctly stated during cross-examination that Lauria had noted that, at 7:08:36 a.m., "MS-4 exits bar." Over defense counsel's objection, Imel answered that Lauria actually had written: "Jean Bruny exits bar and goes to patio." Imel also testified, over defense counsel's objection, that Lauria's notes indicated that, at 7:56:53 a.m., "Jean Bruny shoots Torrance Dawkins and exits toward hallway."

Because we conclude that any error was harmless, we do not reach the question of whether the trial court abused its discretion in allowing the testimony. We emphasize, however, that the court's ruling was troubling. The ruling undermined all attempts to distance

State *v.* Bruny

Imel's testimony from an identification of the defendant. Additionally, although Imel did not testify that he believed that MS-4 was the defendant, his testimony that Lauria's notes indicated that the defendant was the shooter indirectly introduced the opinion of a law enforcement officer that the defendant was depicted in the video surveillance footage.[13] Although we conclude that the state's overwhelming evidence proving that MS-4 was the defendant rendered any error harmless, we reiterate our concerns regarding testimony by members of law enforcement identifying a defendant as depicted in video surveillance footage, as we explain more fully in *State* v. *Gore*, supra, 342 Conn. 158 n.16. See generally G. Bach, "Moderating the Use of Lay Opinion Identification Testimony Related to Surveillance Video," 47 Fla. St. U. L. Rev. 445 (2020) (highlighting problems presented by law enforcement testimony identifying defendants in surveillance video).

Even if the trial court's ruling constituted an abuse of discretion, the defendant has failed to demonstrate that the error was harmful. "The law governing harmless error for nonconstitutional evidentiary claims is well settled. When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal

---

[13] We question whether Lauria would have been permitted—either under the *Finan* rule or under the rule we announced today in *Gore*—to testify regarding his opinion that the defendant was depicted in the video. The indirect manner in which his opinion was introduced circumvented the protections that would have been afforded to the defendant under either *Finan* or *Gore*.

State *v.* Bruny

quotation marks omitted.) *State* v. *Fernando V.*, 331 Conn. 201, 215, 202 A.3d 350 (2019).

The defendant has not demonstrated that the jury's verdict was substantially swayed by the admission of Imel's testimony regarding Lauria's hearsay statements. Under the circumstances of this case, the fact that Lauria opined that the defendant was the individual depicted in the video who shot the victim had little impact on the jury making that determination itself.

Indeed, the state presented overwhelming evidence both that the individual labeled as MS-4 shot the victim and that MS-4 was the defendant. The video surveillance footage provided powerful proof that the individual labeled as MS-4 in the enhanced video shot the victim. In the minutes preceding the shooting, the enhanced video shows MS-4 moving from the corner near the patio door and the raised platform, where his group congregated, toward the emergency exit door, near the victim's group. When the enhanced video displays a split screen in the minute before the shooting, both camera angles are shown. On the right side of the screen, MS-4 remains by the emergency door exit until the individual labeled MS-1, shown on the left side of the screen, throws a bottle in the direction of the victim's group. At that point in the enhanced video, with the exception of the victim, the labeling over individuals no longer is displayed.

On the right side of the screen, immediately after the bottle lands near the victim, however, an individual in the exact spot where MS-4 had just been standing by the emergency exit door moves a couple of feet away from the wall to a spot just behind the victim. This particular individual is highlighted by a halo of light in the enhanced video, making it easy to see that, as he moves, he reaches with his right hand to grab something at his waist. As he raises his right arm, the video shows

State *v.* Bruny

that he is holding a small, dark object, which he points at the back of the victim's head. A small plume of light shoots from the dark object in his hand, then dissipates. As the victim immediately crumbles to the ground, the individual begins to run away. As he crosses over from the right side of the screen to the left side, the label MS-4 appears above him. The enhanced video highlights MS-4's right hand, which is still holding the small, dark object.

Although the enhanced video was a demonstrative exhibit only, the jury watched it as Imel testified about it. After having watched that video, the jury then was able to review the raw video surveillance footage, which was introduced as full exhibits, with a greater understanding of what to look for, from which camera angle, and when, in the raw footage. The raw video surveillance footage displays all of the same events as shown in the enhanced video, including the moment when MS-4 shoots the victim. Accordingly, the raw video surveillance footage, as understood with the assistance of the enhanced video and Imel's testimony, provides overwhelming proof that MS-4 shot the victim.

The state also produced strong evidence, through the raw video surveillance footage, the enhanced video and the testimony of Stephanie, Tyrone and Hopper, that the defendant was the individual labeled as MS-4 in the enhanced video. The enhanced video shows MS-4 entering the club at 7:03:54 or 7:03:55 a.m., immediately behind a heavyset individual, whom the jury reasonably could have identified as Tyrone.[14] Because of his size, Tyrone was particularly easy to identify in the surveillance footage. Tyrone, Stephanie and Hopper each identified the defendant in the raw video surveillance footage as he was entering the club, immediately behind Tyrone, just as MS-4 did in the enhanced video.

---

[14] Witnesses consistently described Tyrone as being overweight. He also testified at trial, so the jury was able to observe his physical characteristics.

All three of the witnesses identified the defendant entering the club immediately behind Tyrone, at 7:03:54 or 7:03:55 a.m., precisely the same time that MS-4 entered the club in the enhanced video. Stephanie also identified the defendant running out of the club at 7:56:59 a.m., at precisely the same time that the enhanced video shows MS-4 running out of the club. All of this testimony, understood in conjunction with the raw video surveillance footage and the enhanced video, proved that the defendant was MS-4. Finally, we observe that the defendant's physical characteristics matched those of MS-4, a fact the jury could observe for itself. Understood within this context, Lauria's opinion that MS-4 was the defendant, who shot the victim, was insignificant and cumulative in the midst of all the other evidence establishing the same point.

Further evidence of the unlikelihood that Lauria's opinion substantially swayed the jury's verdict was the strength of the state's case. As we just explained, the video provided powerful evidence of the defendant's guilt. In addition to the video surveillance footage, the state produced the call detail records of the cell phones used by the defendant and members of his group, showing that they went to the Cheetah Club that night, and DNA evidence proving that the defendant was inside the Cheetah room that night. The state also produced the testimony of a witness that established that the defendant possessed a handgun approximately one month prior to the shooting. See part III of this opinion.

Finally, the state produced substantial consciousness of guilt evidence. In his two interviews with detectives, the defendant claimed he was not at the Cheetah Club on the night of the shooting, even when confronted with the presence of his DNA in the Cheetah room. He claimed that he had been to Connecticut only once, with Stephanie, when he was much younger. And he did not identify his "cousins" Tyrone and Solomon,

State *v.* Bruny

despite the fact that Tyrone testified that he knew the defendant well. The defendant also claimed not to recognize himself when detectives showed him still photographs of the surveillance footage. The state produced evidence that, after the defendant saw the video surveillance footage, he placed a phone call, during which he said to the person on the other end of the line that he had seen the video, that "it's looking real bad," and that he would be lucky if he received fifteen years of imprisonment. During the call, the defendant said that, although the video was not "clear as day," it was "clear enough, damn it."

Given the overall strength of the state's case, the overwhelming evidence that the state produced that the defendant was the individual designated in the enhanced video as MS-4, who shot the victim, and the relative insignificance of Lauria's opinion on that issue, we conclude that the defendant has failed to demonstrate that any error was harmful.

III

The defendant next claims that the trial court abused its discretion in denying his request for a special credibility instruction as to Leon Pruden, a witness who the defendant claims should have been treated as a jailhouse informant. The defendant contends that Pruden was a self-interested witness who had a motive to testify against the defendant. Pruden's credibility, therefore, was inherently suspect. The defendant argues that, because Pruden was the only witness who testified that he had seen the defendant in the possession of a gun on a prior occasion, the admission of Pruden's testimony was harmful error. We conclude that the trial court acted within its discretion in declining to give the requested instruction.

The following additional facts are relevant to our resolution of this issue. At the time of the defendant's

State *v.* Bruny

trial, Pruden was serving a sentence of six years of imprisonment with ten years of special parole. He testified that, during the summer of 2013, he saw the defendant on about five or six occasions at the home of Michelle Saunders, in Waterbury. Pruden knew the defendant only as "Gunner." About one month prior to the shooting, Pruden, Solomon and the defendant were at Saunders' home. When Solomon asked the defendant to "show . . . something" to Pruden, the defendant "pulled out a black handgun from his waist" and "handed it" to Solomon. Solomon then handed the gun back to the defendant, who said nothing. Pruden saw the weapon only briefly and did not know specifically what type of gun it was, only that it was a semiautomatic handgun, "[a] little bigger than [Pruden's] hand."

During cross-examination, defense counsel elicited testimony from Pruden that, although he became aware of the shooting at the Cheetah Club almost immediately, he did not approach the police with the information about his encounter with the defendant until more than six months later, on March 5, 2014, the day that Pruden was arrested. Pruden admitted that he hoped to receive favorable treatment in exchange for the information.

During the charge conference, defense counsel requested a special credibility instruction as to both Watts and Pruden. The trial court granted defense counsel's request as to Watts but denied it as to Pruden. The court observed that, because Watts had testified pursuant to a cooperation agreement, it was reasonable to infer that he was hoping for favorable treatment in exchange for his testimony. By contrast, the court reasoned, at the time of trial, Pruden had already been sentenced.[15]

---

[15] The defendant contends that the trial court gave the instruction as to Watts because it believed it had discretion to do so but did not believe the law gave it discretion to give the same charge as to Pruden. Upon our review of the record, we find this contention, at best, arguable. It is axiomatic that "we read an ambiguous trial court record so as to support, rather than

State *v.* Bruny

We begin our analysis of the defendant's claim with the well established standard of review. "When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Arroyo*, 292 Conn. 558, 566, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010).

"Generally, a [criminal] defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely." (Internal quotation marks omitted.) *State* v. *Patterson*, 276 Conn. 452, 467, 886 A.2d 777 (2005). "This court has held, however, that a special credibility instruction is required for three types of witnesses, namely, complaining witnesses, accomplices and jailhouse informants." (Footnotes omitted.) *State* v. *Diaz*, 302 Conn. 93, 101–102, 25 A.3d 594 (2011).

We previously have defined a "classic jailhouse informant" as "a witness who has testified that the defendant has confessed to him or had made inculpatory statements to him while they were incarcerated together." Id., 99 n.4. In *Patterson*, when we first recognized the exception for jailhouse informants, we applied it to a witness who testified that, while he and the defendant were cellmates in prison, the defendant, who had been

contradict, [the trial court's] judgment." *Walton* v. *New Hartford*, 223 Conn. 155, 167, 612 A.2d 1153 (1992). Therefore, we will not lightly conclude that the trial court erroneously read the case law to deprive it of discretion. Regardless, for the reasons we have discussed in part II B of this opinion, we find any possible error in the trial court's failure to give the requested charge as to Pruden undoubtedly harmless.

State *v.* Bruny

charged with murder, confessed to the witness that he had killed the victim. *State* v. *Patterson*, supra, 276 Conn. 459, 469–70. In exchange for his testimony, the informant in *Patterson* was promised certain benefits. Id., 465. We explained that "an informant who has been promised a benefit by the state in return for his or her testimony has a powerful incentive, fueled by self-interest, to implicate falsely the accused. Consequently, the testimony of such an informant, like that of an accomplice, is inevitably suspect." Id., 469; see *State* v. *Diaz*, supra, 302 Conn. 102–103 (same).

Since *Patterson*, we have twice expanded the jailhouse informant exception to the general rule against requiring a special credibility instruction. In *State* v. *Arroyo*, supra, 292 Conn. 558, we extended *Patterson* to require a special credibility instruction for all jailhouse informants, regardless of whether they had received a promise of a benefit in exchange for their testimony. See id., 561. The mere expectation of a benefit, we reasoned, is sufficient to render the testimony of a jailhouse informant suspect. See id., 568.

Then, more recently, in *State* v. *Jones*, 337 Conn. 486, 254 A.3d 239 (2020), we expanded the definition of "jailhouse informant" to include "witnesses . . . who were incarcerated at the time they offered or provided testimony regarding a defendant's inculpatory statements, regardless of the location where those statements were made." Id., 501. In extending the exception to incarcerated witnesses who testify regarding inculpatory statements that a defendant made to the witness outside of prison, we were guided by two primary principles.

First, we emphasized that "[t]he grave risks posed by false confession testimony from incarcerated informants, and the difficulty of mitigating those risks through meaningful cross-examination, do not depend on the

location where the allegedly false confession occurs.''
Id., 502. False confession evidence, we explained, "is
difficult to impeach effectively because it is invariably
of the he said-she said variety. As long as the [incarcer-
ated informant] can plausibly testify that he had an
opportunity—no matter how fleeting—to speak with
the defendant, the [informant's] claim that the defen-
dant confessed to him is practically unverifiable.''
(Internal quotation marks omitted.) Id., 503.

Second, we recognized the wisdom of harmonizing
our definition of jailhouse informants with the legisla-
ture's recent definition of a "jailhouse witness" as "a
person who offers or provides testimony concerning
statements made to such person by another person with
whom he or she was incarcerated, *or an incarcerated
person who offers or provides testimony concerning
statements made to such person by another person who
is suspected of or charged with committing a criminal
offense.*" (Emphasis in original; internal quotation
marks omitted.) Id., 506–507, quoting Public Acts 2019,
No. 19-132, § 6, codified at General Statutes (Supp.
2020) § 54-86o (d).

In summary, since our initial recognition that a spe-
cial credibility instruction should be required for jail-
house informants, we have expanded that requirement
to include informants who receive no promise of bene-
fits from the state in exchange for their testimony and
incarcerated witnesses who testify that the defendant
confessed or made inculpatory statements to them out-
side of prison. Just as important as understanding what
has changed in our definition of jailhouse informants,
however, is understanding what has not. For purposes
of the exception to the general rule against requiring
special credibility instructions, as harmonized with the
definition of "jailhouse witness" in General Statutes
§ 54-86o (d), a jailhouse informant is a person who
testifies regarding *statements* made by the defendant.

That is, the rule does not extend to testimony regarding observed events.

Limiting the requirement for a special credibility instruction to jailhouse informant testimony concerning a defendant's inculpatory statements is consistent with one of the rationales underlying our adoption of the rule. We repeatedly have emphasized "[t]he grave risks posed by false confession testimony" of jailhouse informants. *State* v. *Jones*, supra, 337 Conn. 502. Indeed, in *Patterson*, we recognized that "testimony about an admission of guilt by the accused may be the most damaging evidence of all . . . ." (Internal quotation marks omitted.) *State* v. *Patterson*, supra, 276 Conn. 470 n.11.

In *State* v. *Diaz*, supra, 302 Conn. 93, we delineated some limitations as to how far we will expand the jailhouse informant exception. See id., 106–13. In that case, we declined to expand the jailhouse informant exception to "whenever a witness in a criminal case is incarcerated or is serving out a sentence, or otherwise is in a position to receive a benefit from the state in exchange for testifying, as long as there is some additional evidence indicating that the witness is not wholly reliable or that he expects some benefit from this testimony." Id., 106. We specifically declined in *Diaz* to expand the exception to include the testimony of "witnesses who are not classic jailhouse informants because they have testified about events that they observed rather than inculpatory statements made by the defendant." Id., 107. We agreed with the defendant that some of the same concerns about reliability are present for witnesses who are involved with the criminal justice system, yet are not treated as jailhouse informants because they testify about observed events rather than the defendant's statements. Id., 109. We emphasized, however, that those concerns are not "as weighty in cases [in which] the witness is not testifying about a . . . con-

State *v.* Bruny

fession, but is testifying about events concerning the crime that the witness observed.'' Id.

We explained: ''Testimony by a jailhouse informant about a . . . confession is inherently suspect because of the ease with which such testimony can be fabricated, the difficulty in subjecting witnesses who give such testimony to meaningful cross-examination and the great weight that juries tend to give to confession evidence. . . . In contrast, when a witness testifies about events surrounding the crime that the witness observed, the testimony can be compared with the testimony of other witnesses about those events, and the ability of the witness to observe and remember the events can be tested. Accordingly, cross-examination and argument by counsel are far more likely to be adequate tools for exposing the truth in these cases than in cases involving jailhouse confessions.'' (Citations omitted.) Id., 109–10.

We therefore reject the defendant's invitation to adopt a rule requiring trial courts to give a special credibility instruction in the present context. In so holding, we do not foreclose the possibility that a trial court may exercise its discretion to give a special credibility instruction even when the jailhouse informant's testimony relates to an event rather than a statement. For example, if the trial court in the present case had determined that a special credibility instruction was warranted as to Pruden, it had the discretion to give one.

It is well established that ''it is within the discretion of a trial court to give a cautionary instruction to the jury whenever the court reasonably believes that a witness' testimony may be particularly unreliable because the witness has a special interest in testifying for the state and the witness' motivations may not be adequately exposed through cross-examination or argument by counsel. In determining whether to give such an instruc-

State *v.* Bruny

tion, the trial court may consider the circumstances under which the witness came forward; the seriousness of the [crimes] with which the witness has been charged or convicted [of]; the extent to which the state is in a position to provide a benefit to the witness and the potential magnitude of any such benefit; the extent to which the witness' testimony is corroborated by other evidence; the importance of the witness' testimony to the state's case; and any other relevant factor.'' Id., 113.

Because Pruden's testimony did not relate to a statement made by the defendant, the trial court acted within its discretion in declining to give a special credibility instruction. Pruden did not testify that the defendant made any statement, incriminating or otherwise, to him. Indeed, he could not, because the events to which Pruden testified occurred prior to the shooting. Although he was incarcerated when he testified, Pruden did not testify that the defendant confessed to him. Instead, Pruden testified that he saw the defendant in possession of a handgun approximately one month before the shooting. Thus, the present case is distinguishable from *Jones*, which involved testimony concerning statements made by the defendant. See *State* v. *Jones*, supra, 337 Conn. 488.

Moreover, defense counsel impeached Pruden's credibility effectively during cross-examination. Defense counsel elicited testimony from Pruden that he did not come forward with the information until the very day that he was arrested, more than six months after he heard about the shooting. Defense counsel also elicited testimony from Pruden that, when he reached out to law enforcement, he knew he was facing a possible thirty years of imprisonment on drug charges and five years of imprisonment for failing to appear. Pruden admitted that he came forward because he was hoping to obtain a benefit for himself. With respect to Pruden's motivation to testify at the time of trial, Pruden admitted

State *v.* Bruny

that, although he was already sentenced, he was aware of the possibility of a sentence modification.

Defense counsel presented testimony from an expert witness who testified about the unreliability of jailhouse informants and specifically testified regarding benefits, such as sentence modification, that incarcerated informants who are already sentenced may receive. Defense counsel highlighted the problem during closing argument, saying of Pruden, "it is the hope for benefits that causes the problem, the unreliability. Pruden had an incentive to lie that is different from an ordinary witness; that's why you need to look carefully at this testimony."

In light of this record and our applicable precedent, we conclude that the trial court acted within its discretion in declining to give a cautionary instruction as to Pruden.

IV

The defendant next claims that the trial court improperly denied the defendant's motion to suppress the out-of-court and in-court identifications of the defendant made by Watts. Even if we assume, without deciding, that the identifications should have been suppressed, we conclude that any error was harmless.[16]

The following additional facts and procedural background are relevant to our resolution of this issue. The defendant moved to suppress Watts' out-of-court identification of the defendant and to preclude him from making an in-court identification, claiming that the identifications resulted from unduly suggestive procedures.

---

[16] Because we resolve the defendant's claim on the basis that any error was harmless, we need not address the parties' arguments regarding whether this court should revisit its holding in *State* v. *Holliman*, 214 Conn. 38, 46, 570 A.2d 680 (1990), that the admissibility of identification evidence resulting from the actions of private citizens turns on the same due process analysis that applies to identifications that are the result of state action.

State *v.* Bruny

The trial court conducted a hearing on the motion prior to trial but continued it until the day that Watts was scheduled to testify. During the hearing, the court heard testimony from Watts and Detective Zaweski, which we summarize.

Zaweski first spoke to Watts on the night of the shooting. At that time, Watts told Zaweski only that he and the victim had arrived at the club minutes before Watts heard a gunshot. Watts ran out of the club and realized only afterward that the victim had been shot.

Zaweski next interviewed Watts more than one year later, on November 18, 2014, when Watts had been subpoenaed to testify before a federal grand jury. During this interview, Watts told Zaweski that his group had just arrived at the club and that they were waiting at the bar for their drinks when Watts saw Hall, whom he recognized. Hall saw Watts' group, left the Cheetah room through the patio door, and returned minutes later with a number of people who Watts claimed he did not recognize. Hall held a bottle in his hand. He splashed liquid at the victim, who asked Watts to give him his knife, which Watts had on his person. With the exception of a man wearing a red shirt, the men with Hall began to form a semicircle in front of Watts' group. The man in the red shirt, who was with Hall's group, moved away from his associates and positioned himself near the emergency exit door. He wore a hat with the brim low over his face, obscuring it. When Watts heard the shot, he ran out of the club.

In January, 2017, Watts, who was in custody at the time on pending criminal matters, told Zaweski that he wanted to cooperate. During a meeting with Zaweski that month, Watts told him that, a few days after the shooting, when Watts was searching for the shooter, an acquaintance of his texted Watts a photograph of the defendant.

State *v.* Bruny

On July 26, 2017, Zaweski met with Watts for a fourth time. For the meeting, Watts was transported to the courthouse from prison and then placed in the courthouse lockup. On that same day, the defendant, who was in custody for the murder of the victim, also was being transported to the same courthouse. When Watts was being placed in his cell in the lockup, the defendant was already there, in another cell. Although the defendant attempted to hide his face, Watts saw him, and he recognized the defendant from the night of the shooting. Although Watts consistently stated that he did not see the shooting, he claimed that he was certain that the defendant was the person who shot the victim.

When Watts arrived at the meeting with Zaweski, he informed him that he had just seen the defendant. He told Zaweski that he now realized that he had seen the defendant not only on the night of the shooting, but also on a prior occasion. In July, 2013, Watts attended a memorial service in Waterbury. As Watts sat in his car, about to leave the event, the defendant approached the passenger door and looked into the vehicle. It was nighttime, but there were streetlights, so Watts could see the defendant's face clearly. At that moment, the police were driving down the street, so the defendant walked away. Watts told Zaweski that the person he saw at the memorial service was the same person he saw at the Cheetah Club wearing a red shirt and hat. Watts was not shown any photographs or any portion of the surveillance video during this meeting.

On August 29, 2017, Zaweski showed Watts a photographic array. Because Zaweski was the investigating officer for the case, he conducted the array using a procedure called the blind folder shuffle method.[17] Dur-

---

[17] See General Statutes § 54-1p (c) (2) ("[t]he identification procedure shall be conducted in such a manner that the person conducting the procedure does not know which person in the photo lineup or live lineup is suspected as the perpetrator of the offense, except that, if it is not practicable to conduct a photo lineup in such a manner, the photo lineup shall be

State *v.* Bruny

ing the procedure, which was not recorded, Watts identified the defendant. On the defendant's photograph, Watts wrote, "I'm very certain this person killed my cousin, August 11, 2013."

During the August, 2017 interview, Watts likely also viewed, for the first time, the enhanced video created by Imel. Although Watts could not recall whether he was shown the video during the July or the August, 2017 meeting, he acknowledged that he viewed it during one of the two meetings. Detective Zaweski testified that Watts was not shown any video surveillance footage during the July 26, 2017 meeting. Watts admitted that, by the time of trial, he had viewed the enhanced video an additional three or four times during meetings with the prosecutors in the case.

The trial court allowed Watts to testify regarding the identifications but precluded him from referring to the defendant as "the shooter." The trial court reasoned that the defendant's objections to the identifications went to their weight, not admissibility.

Even if we assume, without deciding, that the trial court abused its discretion in admitting Watts' identification of the defendant, we conclude that any error was harmless. We are not persuaded that the jury's verdict was swayed by the claimed error. See, e.g., *State* v. *Fernando V.*, supra, 331 Conn. 215. As we explained in part II B of this opinion, the state's case was strong—we need not reiterate that portion of our analysis. We emphasize, however, that the strength of the state's case did not stem from the testimony of any eyewitnesses to the shooting. There were no such eyewitnesses. The overwhelming nature of the state's case hinged, instead,

conducted by the use of a folder shuffle method, computer program or other comparable method so that the person conducting the procedure does not know which photograph the eyewitness is viewing during the procedure'').

State *v.* Bruny

on the fact that the defendant was captured on the surveillance video shooting the victim.

Defense counsel impeached Watts' credibility thoroughly and effectively during cross-examination, highlighting the many inconsistencies in Watts' various stories as they evolved each time he met with law enforcement. Defense counsel particularly emphasized Watts' testimony before a federal grand jury in November, 2014, during which Watts stated that, with the exception of Hall, he had never seen anyone in the defendant's group before.[18] Before the grand jury, Watts made no mention either of receiving a text message with the defendant's photograph, or of seeing the defendant at a memorial service. He also testified before the grand jury that the shooter wore a brimmed, black hat.

At trial, Watts claimed that, after he heard the gun shot, he saw the defendant run and fall. When the defendant fell, Watts saw that the defendant held a gun in his hand. Watts admitted during cross-examination, however, that he said nothing to the grand jury about seeing a gun on the night of the shooting. He also admitted that, by the time of trial, he had viewed the video multiple times.

Defense counsel also highlighted, during cross-examination, that Watts waited for approximately three and one-half years to come forward, even though the victim was his "favorite little cousin," whom he had known his entire life. When Watts finally came forward, he was incarcerated for various offenses, including assault in the first degree, criminal possession of a firearm and violation of probation—he admitted he could have received up to forty years of imprisonment for the charges. Defense counsel emphasized Watts' motive to lie because Watts was testifying pursuant to a coopera-

___

[18] At the time of his testimony before the grand jury, Watts was not incarcerated, and he had no pending criminal charges.

State *v.* Bruny

tion agreement, had not yet been sentenced and expected that the prosecutor would inform the sentencing court about his cooperation in the present case.

The testimony of the defendant's expert witness on the unreliability of jailhouse informant testimony further reinforced Watts' motivation to lie. The expert witness also described the ways in which jailhouse informants are able to learn information about a defendant's case that the informant may use to his benefit. During closing argument, defense counsel once again laid out the many inconsistencies in Watts' various stories and emphasized the correspondence between the change in Watts' version of events and his need for assistance with his own pending criminal matters.

The trial court gave a special credibility instruction as to Watts, reminding the jury that Watts was testifying pursuant to a cooperation agreement: "A witness who has entered into such an agreement has an interest in this case different from any ordinary witness. A witness who realizes that he may be able to receive a lighter sentence by giving testimony favorable to the state has a motive to testify falsely. You must examine his testimony with caution and weigh it with great care. If, after scrutinizing his testimony, you decide to accept it, you may give it whatever weight you find it deserves, and all of these are factors that you may consider in finding the facts."

Watts' testimony was also cumulative of other, more persuasive evidence. As we already observed, the video surveillance footage displayed the defendant shooting the victim. Three witnesses, including the defendant's foster mother and his cousin, who had both known him for nine years, identified the defendant in the video footage. Watts' testimony—that he recognized the defendant as one of the people in the club on the night of the shooting, observed the defendant move to a position

State *v.* Bruny

behind the victim and saw a gun in the defendant's hand when he fell while running out of the Cheetah room— merely echoed what the jurors saw with their own eyes. Even if we assume that the trial court admitted the identifications in an abuse of discretion, any error was harmless.[19]

V

Finally, we address the defendant's claim that there was insufficient evidence to support his conviction for criminal possession of a pistol or revolver in violation of § 53a-217c (a) (1). Specifically, the defendant contends that the state failed to prove that the gun used in the shooting had a barrel length of less than twelve inches. We disagree.

We begin with the well established principles governing our review of a claim that there is insufficient evidence to support a conviction. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the [jury's] verdict [or the trial court's finding]. Second, we determine whether upon the facts so construed and the

---

[19] The defendant also claims that Watts' identification of the defendant was "so unreliable that it deprived [the defendant] of his due process right to a fair trial." *State* v. *Johnson*, 312 Conn. 687, 705 n.20, 94 A.3d 1173 (2014). For claims of constitutional magnitude, the state bears the burden of proving that any error was harmless beyond a reasonable doubt. See, e.g., *State* v. *Joseph A.*, 336 Conn. 247, 268, 245 A.3d 785 (2020). We conclude that that standard has been met in the present case. As we explained, defense counsel successfully attacked Watts' credibility on numerous fronts during cross-examination and in closing argument. The defendant's expert witness cast further doubt on Watts' testimony, and the trial court gave a special credibility instruction as to Watts. More important, the persuasive force of Watts' cumulative testimony paled in comparison to the video surveillance footage showing the defendant shooting the victim. For all these reasons, we are "persuaded 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *State* v. *Cushard*, 328 Conn. 558, 582, 181 A.3d 74 (2018), quoting *Chapman* v. *California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt.'' (Internal quotation marks omitted.) *State* v. *Davis*, 324 Conn. 782, 793, 155 A.3d 221 (2017).

As we noted previously in this opinion, the criminal possession of a pistol or revolver count was tried to the court. Section 53a-217c provides in relevant part: ''(a) A person is guilty of criminal possession of a pistol or revolver when such person possesses a pistol or revolver, as defined in section 29-27, and (1) has been convicted of a felony . . . .'' General Statutes § 29-27 defines ''pistol'' or ''revolver'' as ''any firearm having a barrel less than twelve inches in length.'' The parties stipulated to the trial court that the defendant was a convicted felon prior to August 11, 2013. The court addressed the criminal possession of a pistol or revolver count after the jury had found the defendant guilty of murdering the victim in the shooting on August 11, 2013. Therefore, to secure a conviction under § 53a-217c (a) (1), the state was required to prove that the gun the defendant used in the shooting had a barrel length of less than twelve inches.

In addressing a defendant's sufficiency of the evidence challenge to a conviction for carrying of a pistol or revolver without a permit in violation of § 29-35 (a), we expressly have held that ''direct, numerical evidence is not required to prove barrel length. . . . In the absence of direct, numerical evidence of barrel length, this element may be satisfied by evidence that is sufficiently indicative of the size of the firearm so as to permit the jury to reasonably and logically infer beyond a reasonable doubt that its barrel is less than twelve inches in length.'' (Citation omitted; emphasis omitted.) *State* v. *Covington*, 335 Conn. 212, 220, 229 A.3d 1036 (2020). In *Covington*, we held that the barrel length element had been proven by sufficient evidence when

State *v.* Bruny

the state presented testimony from a witness who observed the gun in question inside an average sized glove compartment in a sedan and later observed the defendant's friend pull the gun "out of his waistband and hand it to the defendant." (Internal quotation marks omitted.) Id., 221–22; see, e.g., *State* v. *Williams*, 231 Conn. 235, 252, 645 A.2d 999 (1994) (evidence was sufficient to prove barrel length was less than twelve inches when state presented witnesses who testified that defendant pulled " 'small handgun' " from his " 'waist length jacket' "), overruled in part on other grounds by *State* v. *Murray*, 254 Conn. 472, 757 A.2d 578 (2000); *State* v. *Miles*, 97 Conn. App. 236, 242, 903 A.2d 675 (2006) (evidence was sufficient to prove barrel length was less than twelve inches when witnesses testified that they saw defendant with small, silver handgun).

In the present case, the state produced sufficient evidence that the barrel length of the gun was less than twelve inches. Although the gun was not introduced into evidence and no person testified that he or she saw the gun on the night of the shooting, the gun can be seen in the video surveillance footage. Specifically, in the video, when the shooter aims the gun at the victim's head, the weapon is visible in the shooter's hand and appears to be approximately the size of his hand. James Stephenson, a firearm and tool mark examiner at the state's forensics lab, examined the bullet fragments that were removed from the victim's body. He testified that the rifling characteristics of the bullet jacket were consistent with that of a .38 caliber firearm. He further testified that he entered the lands and grooves on the surface of the bullet, as well as the diameter of the bullet, into a general rifling characteristics file compiled by the FBI, which yielded a nonexhaustive list of fifteen possible manufacturers that made firearms that could have fired the bullet. All of those firearms were pistols with a barrel length of less than

State *v.* Bruny

twelve inches. Finally, the state introduced the testimony of Pruden, who testified that, approximately one month prior to the shooting, he saw the defendant in possession of a semiautomatic handgun, "[a] little bigger than [Pruden's] hand."

From this evidence, the trial court reasonably could infer that the barrel of the handgun used by the defendant was less than twelve inches long. It is highly unlikely that Pruden would describe the gun as a little bigger than his hand if the barrel was more than one foot long. Stephenson's testimony, although not conclusive, does provide additional support for the finding that the gun barrel was the requisite length. This finding is further supported by the video surveillance footage, which shows the shooter wielding a small handgun. Accordingly, we conclude that the state produced sufficient evidence to prove the barrel length element beyond a reasonable doubt.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and McDONALD, D'AURIA, KAHN and KELLER, Js., concurred.

ECKER, J., concurring. I agree with, and join, parts I, II and IV of the majority opinion, and I concur in the result reached in part III regarding the trial court's failure to issue a special credibility instruction with respect to the state's witness, Leon Pruden. In my view, the trial court should have instructed the jury that Pruden was a jailhouse informant whose testimony should be examined with greater scrutiny than that of an ordinary witness because, as Justice Palmer explained in his concurring opinion in *State* v. *Diaz*, 302 Conn. 93, 121, 25 A.3d 594 (2011), "informers seeking a benefit from the state have a strong motive to falsely inculpate the accused, and because the state has a strong incentive not to enter into an express or explicit agreement

State *v.* Bruny

with such witnesses, preferring, instead, to keep any such understanding unstated . . . .'' Nonetheless, I conclude that the instructional error was harmless on the present factual record, and I therefore agree with the majority that the judgment of conviction should be affirmed.

The majority grounds its decision in part III on the putative distinction between a jailhouse informant who hopes for beneficial treatment from the state in exchange for testimony "regarding *statements* made [to the informant] by the defendant," on the one hand, and an informant who seeks the very same benefit in exchange for testimony regarding "events" that were "observed" by the informant, on the other. (Emphasis in original.) Part III of the majority opinion. The majority points out that this distinction derives from the majority opinion in *State* v. *Diaz*, supra, 302 Conn. 93, which concluded that it was not plain error for the trial court to fail to give a special credibility instruction, in the absence of a request by the defendant, if the informants "testified only about the events surrounding the shooting" as opposed to the defendant's statements about those events. Id., 104. The *Diaz* majority also declined to exercise its supervisory authority to require a special credibility instruction for all incarcerated informants who testify about "events surrounding the crime that [they] observed . . . .'' Id., 110.

Despite the broad language in *Diaz*, our holding in that case was quite narrow—a trial court is not required, sua sponte, to issue a special credibility instruction for incarcerated witnesses who testify about events they observed if such an instruction has not been requested by the defendant.[1] The present appeal is distinguishable

___

[1] I understand that this court stated in *Diaz* that "the trial court's failure to give a special credibility instruction . . . would not have been improper even if the defendant had requested such an instruction"; *State* v. *Diaz*, supra, 302 Conn. 104; but that statement was made in the context of plain error analysis, and I take it to mean simply that, even if the request had

State *v.* Bruny

from *Diaz* because the defendant in this case, unlike the defendant in *Diaz*, filed a timely and otherwise proper request for a special credibility instruction at trial and, therefore, does not seek relief on appeal under either the plain error or supervisory authority doctrine. The procedural point is significant because reversal for plain error "is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007). Again, a defendant cannot establish plain error when, as in *Diaz*, the substantive legal right urged by the defendant would have required an *extension* of existing law. See *State* v. *Diaz*, supra, 302 Conn. 104 n.8 ("[i]t is axiomatic that the trial court's proper application of the law existing at the time of trial cannot constitute reversible error under the plain error doctrine"). Likewise, the majority's refusal to exercise its supervisory authority in *Diaz* does not determine the result here because this court's supervisory powers represent "an extraordinary remedy that should be used sparingly . . . ." (Internal quotation marks omitted.) *State* v. *Edwards*, 314 Conn. 465, 498, 102 A.3d 52 (2014). *Diaz*, in short, does not control the open issue of whether a trial court must give a special credibility instruction when requested by a defendant in

been made by the defendant, an adverse ruling by the trial court would not have been improper *under existing law*. See id., 104 n.8 ("[i]t is axiomatic that the trial court's proper application of the law existing at the time of trial cannot constitute reversible error under the plain error doctrine"). To the extent that the quoted language was intended to signal that this court would have rejected the defendant's argument for an extension of the existing law if, hypothetically, his claim had been properly preserved for appellate review, the statement was pure dictum and does not bind us. See, e.g., *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control*, 270 Conn. 778, 810, 855 A.2d 174 (2004) (statements that are not essential to court's holding "may be regarded as dicta and, thus, not binding").

State *v.* Bruny

the case of an informant who hopes to obtain favorable treatment from the state in exchange for testimony about an event that he or she claims to have witnessed.

Turning to that open issue, I do not find the distinction between informants who testify about events perceived and those who testify about statements overhead to be a persuasive basis on which to deny a timely requested special credibility instruction. The *Diaz* majority cited absolutely *no* authority in support of this distinction, and my research has uncovered none.[2] In language quoted and adopted by the majority in this case; see part III of the majority opinion; the majority in *Diaz* baldly asserted that "[t]estimony by a jailhouse informant about a . . . confession is inherently suspect because of the ease with which such testimony can be fabricated, the difficulty in subjecting witnesses who give such testimony to meaningful cross-examination and the great weight that juries tend to give to confession evidence. . . . *In contrast, when a witness testifies about events surrounding the crime that the witness observed, the testimony can be compared with the testimony of other witnesses about those events, and the ability of the witness to observe and remember the events can be tested. Accordingly, cross-examination and argument by counsel are far more likely to be adequate tools for exposing the truth in these cases than in cases involving jailhouse confessions.*" (Cita-

_____

[2] The other cases on which the majority in the present case relies, namely, *State* v. *Jones*, 337 Conn. 486, 254 A.3d 239 (2020), *State* v. *Arroyo*, 292 Conn. 558, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010), and *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005), lend no support to its conclusion that a special credibility instruction is unnecessary when an incarcerated informant testifies about an event rather than a statement. These cases did not involve or discuss jailhouse informant testimony regarding an event; they involved only jailhouse informant testimony regarding a defendant's statements and hold that a special credibility instruction is necessary in that context. Nothing in *Jones*, *Arroyo*, or *Patterson* implies that a special credibility instruction is unnecessary, inappropriate, or inadvisable in the present context.

State *v.* Bruny

tions omitted; emphasis added.) *State* v. *Diaz*, supra, 302 Conn. 109–10.

Again, *Diaz* provided no legal authority to establish the truth or accuracy of the italicized assertion. Nor does the majority in the present case identify any basis for the conclusion. It is, of course, true that testimony about a confession *sometimes* may be more difficult to verify or to discredit than testimony about an event. But the converse is also true: testimony about an event may be more difficult to verify or to discredit than testimony about a statement. This should not surprise us because a statement *is* an event, and the ease or difficulty of proving any event will depend on the circumstances. Spoken words are intangible and evanescent, and they leave no mark unless recorded. Many events—including the momentary display of a gun in a private space, which allegedly occurred in Pruden's presence—are equally impermanent. The relative difficulty of testing the credibility of an informant who testifies regarding such statements or events will depend on the underlying factual circumstances. Was it physically possible that the informant was in the particular location at the particular time of the alleged statement or event? Was there anyone else present to corroborate the informant's testimony? Does the content of the informant's testimony (including the level of detail, corroborating facts, etc.) help establish or undermine the claim of veracity? Did the informant make a record or tell anyone about the statement or event soon after its occurrence? In more concrete terms, if Pruden testified that he had heard the defendant confess one month after the shooting instead of testifying that he had seen the defendant's gun one month before the shooting, why would it be so much more difficult to cross-examine him about the veracity of that testimony? Alternatively, if he had testified that

State *v.* Bruny

he saw the defendant in possession of the gun when no
one else was present, why would it be any less difficult
to cross-examine him about the veracity of that testi-
mony? These questions may help to explain why the
distinction articulated by the majority in *Diaz* and relied
on by the majority in the present case lacks support-
ing authority.

Even accepting, purely for the sake of argument, the
claim that testimony about past statements is harder
to disprove than testimony about past events, I would
still disagree that this thin distinction justifies a differ-
ent rule governing special credibility instructions. For
the reasons explained in Justice Palmer's compelling
concurring opinion in *Diaz*; *State* v. *Diaz*, supra, 302
Conn. 115–22 (*Palmer, J.*, concurring); the majority is
mistaken when it asserts that the central rationale ani-
mating the cases adopting the special credibility instruc-
tion is inapplicable in the present context. See part III
of the majority opinion. This misapprehension derives
from a misidentification of that rationale. The need for
a special credibility instruction is not driven primarily
by concerns about the relative difficulty involved in
disproving the informant's testimony. Rather, as we
explained in *State* v. *Patterson*, 276 Conn. 452, 886 A.2d
777 (2005), the primary and predominant concern at
stake is that "an informant who has been promised a
benefit by the state in return for his or her testimony has
a powerful incentive, fueled by self-interest, to implicate
falsely the accused. Consequently, the testimony of
such an informant, like that of an accomplice, is inevita-
bly suspect. As the United States Supreme Court observed
 . . . years ago, [t]he use of informers, accessories,
accomplices, false friends, or any of the other betrayals
which are dirty business may raise serious questions
of credibility. *On Lee* v. *United States*, 343 U.S. 747,
757, 72 S. Ct. 967, 96 L. Ed. 1270 (1952). The United
States Supreme Court therefore has allowed defendants

State *v.* Bruny

broad latitude to probe [informants'] credibility by
cross-examination and ha[s] counseled submission of
the credibility issue to the jury *with careful instruc-
tions.* . . . *Banks* v. *Dretke*, 540 U.S. 668, 702, 124 S.
Ct. 1256, 157 L. Ed. 2d 1166 (2004), quoting *On Lee* v.
*United States*, supra, 757; see *Hoffa* v. *United States*,
385 U.S. 293, 311–12, 87 S. Ct. 408, 17 L. Ed. 2d 374
(1966). Indeed, the court recently has characterized such
instructions as one of the customary, truth-promoting
precautions that generally accompany the testimony of
informants. *Banks v. Dretke*, supra, 701. Because the
testimony of an informant who expects to receive a
benefit from the state in exchange for his or her cooper-
ation is no less suspect than the testimony of an accom-
plice who expects leniency from the state . . . the
defendant was entitled to an instruction substantially
in accord with the one that he had sought.'' (Emphasis
in original; footnote omitted; internal quotation marks
omitted.) *State* v. *Patterson*, supra, 469–70.

This fundamental rationale applies when an incarcer-
ated informant, hoping for a benefit from the state in
exchange for his or her testimony, testifies about any
past event, whether it be a statement or some other
alleged occurrence. ''A special credibility instruction,
which cautions the jury to review the testimony of such
an informer with particular scrutiny and to weigh his
or her testimony with greater care than the testimony of
an ordinary witness, is important in such circumstances
because a defendant has a strong interest in ensuring
that the jury appreciates the potential that exists for
false testimony due to the informer's self-interest.'' *State*
v. *Diaz*, supra, 302 Conn. 115 (*Palmer, J.*, concurring).
It is that simple.[3]

_____

[3] The second ground on which the majority relies is ''the wisdom of
harmonizing our definition of jailhouse informants with the legislature's
recent definition of a 'jailhouse witness' as 'a person who offers or provides
testimony concerning statements made to such person by another person
with whom he or she was incarcerated, or an incarcerated person who
offers or provides testimony concerning statements made to such person

State *v.* Bruny

Applying these principles to the present case, I conclude that Pruden was a jailhouse informant and, therefore, that the defendant was entitled to the requested special credibility instruction. Pruden observed the defendant with a semiautomatic, black handgun one month before the shooting, but he did not approach the police with this inculpatory information until March 5, 2014— the day he was arrested in connection with a pending drug case. Pruden admitted that he hoped that, by sharing this information with the police, he would receive favorable treatment in his own criminal proceeding. Under these circumstances, it is beyond dispute that Pruden had "a powerful incentive, fueled by self-interest, to implicate falsely the accused," and his testimony, therefore, was "inevitably suspect." *State* v. *Patterson*, supra, 276 Conn. 469. Accordingly, I would hold that the trial court abused its discretion in denying the defendant's request for a special credibility instruction.

Nonetheless, I also would conclude that the trial court's failure to issue the requested instruction was

by another person who is suspected of or charged with committing a criminal offense." (Internal quotation marks omitted.) Part III of the majority opinion, quoting *State* v. *Jones*, 337 Conn. 486, 506–507, 254 A.3d 239 (2020). The court in *Jones* expanded the definition of a jailhouse informant for purposes of a special credibility jury instruction and explained that one reason to do so was to adopt a definition matching the legislative definition of a "jailhouse witness" set forth in § 6 of No. 19-132 of the 2019 Public Acts, which is codified at General Statutes § 54-86o (d). See *State* v. *Jones*, supra, 505–507. In *Jones*, however, we could "think of no reason to employ a *more restrictive definition than the one adopted by the legislature to address precisely the same policy concern, namely, the potential unreliability of a jailhouse witness' testimony* . . . ." (Emphasis added.) Id., 507 n.12. Nothing in the logic or reasoning of *Jones* requires the rule to remain forever frozen thereafter or prevents the legislature or this court from adopting a more expansive definition of "jailhouse informant" or "jailhouse witness" to protect against the potential unreliability of such a witness' testimony. Indeed, in *Jones*, we recognized that it was not "necessary to harmonize the definitions" but that it was "preferable to do so unless there is a good reason" to depart from the legislative definition. (Emphasis omitted.) Id. In my view, there is good reason to depart from the legislative definition to address the situation presented in this case, and I see this departure as wholly consistent with the policy underlying the statute.

State *v.* Bruny

harmless. Such an error "is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . Several factors guide our determination of whether the trial court's failure to give the requested instruction was harmful. These considerations include: (1) the extent to which [the jailhouse informant's] apparent motive for falsifying his testimony was brought to the attention of the jury, by cross-examination or otherwise; (2) the nature of the court's instructions on witness credibility; (3) whether [the informant's] testimony was corroborated by substantial independent evidence; and (4) the relative importance of [the informant's] testimony to the state's case." (Internal quotation marks omitted.) *State* v. *Jones*, 337 Conn. 486, 509, 254 A.3d 239 (2020).

As the majority points out, "defense counsel effectively impeached the credibility of Pruden during cross-examination" by eliciting "testimony from Pruden that he did not come forward with this information until the very day that he was arrested, seven months after he heard about the shooting," and that he only "came forward because he was hoping to obtain a benefit for himself." Part III of the majority opinion. Indeed, the defendant presented expert testimony regarding the unreliability of jailhouse informant testimony, and "[d]efense counsel highlighted the problem during closing argument, saying of Pruden, 'it is the hope for benefits that causes the problem, the unreliability. Pruden had an incentive to lie that is different from an ordinary witness; that's why you need to look carefully at this testimony.' " Id. The jury was made well aware of Pruden's apparent motive to testify falsely.

The trial court also gave a general credibility instruction that directed the jury to consider, among other things, whether a witness had "an interest in the outcome of the case or any bias or prejudice concerning any party or any matter involved in the case . . . ." The

trial court did not name Pruden in its special credibility instruction, but it did instruct the jury on the dangers posed by jailhouse informant testimony, and the expert witness and defense counsel both urged the jury to consider these dangers when assessing the credibility of Pruden's testimony. In combination with the other information made available to the jury regarding the potential unreliability of this testimony, the jury had the tools at its disposal to scrutinize Pruden's testimony more carefully than that of an ordinary witness.

Admittedly, Pruden's testimony regarding the defendant's possession of a gun one month before the shooting was not corroborated, but Pruden was not an eyewitness to the crime, nor was his testimony necessary to convict the defendant. Indeed, Pruden's testimony was relatively unimportant to the state's case, which relied predominately on the video footage of the Cheetah Club, as well as the eyewitness and DNA evidence placing the defendant at the club on the night of the murder, despite the defendant's contrary statements to the police. On the whole, I am confident that the trial court's failure to issue the requested special credibility instruction did not substantially affect the jury's verdict.

For the foregoing reasons, I concur in the result reached in part III of the majority opinion.